UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-2276

AMERICAN AUTOMOBILE MANUFACTURERS
ASSOCIATION, ET AL.,

Plaintiffs, Appellants,

v.

COMMISSIONER, MASSACHUSETTS DEPARTMENT
OF ENVIRONMENTAL PROTECTION, ET AL.,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. A. David Mazzone, Senior U.S. District Judge]

Before

Selya, Circuit Judge,

Bownes, Senior Circuit Judge,

and Cyr, Circuit Judge.

Edward W. Warren, with whom Daniel F. Attridge, Stuart A.C.

Drake, Gary E. Marchant, Kirkland & Ellis, Robert F. Sylvia, Eric F.

Eisenberg, Hinckley, Allen & Snyder, Phillip D. Brady, V. Mark

Slywynsky, Of Counsel, American Automobile Manufacturers Association,

Charles H. Lockwood, and John T. Whatley, Of Counsel, Association of

International Automobile Manufacturers, Inc., were on brief for
appellants.
James R. Milkey, Assistant Attorney General, Deputy Chief,

Environmental Protection Division, with whom Scott Harshbarger,

Attorney General of the Commonwealth of Massachusetts, and David G.

Bookbinder, Assistant Attorney General, were on brief for appellee

Commissioner, Massachusetts Department of Environmental Protection.
William H. Lewis, Jr., Hunter L. Prillaman, Morgan, Lewis &

Bockius, Paul F. Ware, Jr., Michael J. Meagher, Scott L. Robertson,

Goodwin, Procter & Hoar, G. William Frick, and David T. Deal, Of

Counsel, American Petroleum Institute on brief for appellee American
Petroleum
Institute.
Lois J. Schiffer, Acting Assistant Attorney General, David C.

Shilton, Timothy J. Dowling, Attorneys, Environment and Natural

Resources Division, Jean C. Nelson, General Counsel, Alan W. Eckert,

Associate General Counsel, and Michael J. Horowitz, Attorney, Office

of General Counsel, United States Environmental Protection Agency, on
brief for the United States, amicus curiae.
Jacqueline M. Warren, and Berle, Kass & Case on brief for

American Lung Association, Natural Resources Defense Council, and
Conservation Law Foundation, amici curiae.
G. Oliver Koppel, Attorney General of the State of New York,

Peter H. Schiff, Deputy Solicitor, Val Washington, Joan Leary

Matthews, Helene G. Goldberger, Assistant Attorneys General; Michael

E. Carpenter, Attorney General of the State of Maine, Sarah Roberts

Walton, Assistant Attorney General; Jeffrey L. Amestoy, Attorney

General of the State of Vermont, J. Wallace Malley, Jr., Deputy

Attorney General; Jeffrey B. Pine, Attorney General of the State of

Rhode Island, and Michael Rubin, Assistant Attorney General and

Environmental Advocate, on brief for the States of New York, Maine,
Vermont, and Rhode Island, amici curiae.

August 3, 1994

BOWNES, Senior Circuit Judge. Plaintiffs-
BOWNES, Senior Circuit Judge.

appellants, the Massachusetts State Automobile Dealers

Association, Inc. and two trade groups of automobile

manufacturers, appeal from an order denying their request for

a preliminary injunction. Plaintiffs seek to stall the

implementation of motor vehicle tailpipe emissions

regulations adopted by defendant-appellee, the Commissioner

of the Massachusetts Department of Environmental Protection

(DEP). See Mass. Regs. Code tit. 310, 7.40-7.60.

Defendant-appellee, the American Petroleum Institute,

intervened in support of the regulations.

Prior to oral argument, plaintiffs moved to dismiss

their appeal as to all issues but one: whether DEP's 1995

model year requirements should be enjoined. DEP opposes the

motion for partial dismissal and requests costs and

attorney's fees. We grant the motion for partial dismissal.

We award DEP costs, but not attorney's fees. With respect to

the 1995 model year requirements, the order of the district

court is affirmed. I.
I.

BACKGROUND

A. Cars and the Clean Air Act

The exhaust from a gasoline-powered engine is a

source of air pollution. Motor Vehicle Mfrs. Ass'n v. New

York Dep't of Envtl. Conservation, 17 F.3d 521, 524 (2d Cir.

1994) (hereinafter MVMA). Emissions from car tailpipes

-3-
3

include hydrocarbons and nitrogen oxides (NOx), constituents

of ground-level ozone, a major component of smog. Id. at

526.

The Clean Air Act is the federal legislation

governing tailpipe emissions. The Act directs the United

States Environmental Protection Agency (EPA) to establish

national ambient air quality standards (NAAQS) for pollutants

such as ground-level ozone. Under the Act, states are

responsible for developing and enforcing a plan, subject to

EPA approval, for attaining and maintaining the NAAQS by

regulating sources of air pollution. 42 U.S.C. 7410(a).

States failing to meet the NAAQS risk sanctions, including

the loss of federal highway funds. Id. 7509. EPA has

designated the entire state of Massachusetts as a "serious"

nonattainment area for the ozone NAAQS. See 56 Fed. Reg.

56,694, 56,776 (Nov. 6, 1991).

Mobile sources of air pollution such as cars and

trucks are subject to EPA regulation under 202 and 207 of

the Act, 42 U.S.C. 7521, 7541. EPA emissions standards

for hydrocarbons and nitrogen oxides apply to a given vehicle

based on its weight, use classification, and model year. See

id. 7521, 7541; MVMA, 17 F.3d at 525-26.

State regulation of motor vehicle emissions is

generally preempted by the Clean Air Act, 42 U.S.C.

7543(a), with one exception: California can enforce its own

-4-
4

standards, subject to EPA approval by way of a waiver under

209(b) of the Act, id. 7543(b) (the waiver requirement).

Consequently, there can be only two types of cars "created"

under emissions regulations in this country: "California"

cars and "federal" (that is, EPA-regulated) cars. See id.

7507. Other states cannot take any action that would force

manufacturers to create a "third vehicle."1 Id. (the third

vehicle requirement).

Section 177 of the Act allows other states to adopt

standards "identical" to California's (the identicality

requirement), but only if there is a two-year time lapse

between the time the standards are adopted and the first

model year affected by those standards (the leadtime

requirement). Id. Similarly, 211 of the Act authorizes

EPA to regulate motor fuels and preempts any unapproved state

1. The third vehicle provision states:
Nothing in this section . . . shall be
construed as authorizing any . . . State
to prohibit or limit, directly or
indirectly, the manufacture or sale of a
new motor vehicle or motor vehicle engine
that is certified in California as
meeting California standards, or to take
any action of any kind to create, or have
the effect of creating, a motor vehicle
or motor vehicle engine different than a
motor vehicle or engine certified in
California under California standards (a
"third vehicle") or otherwise create such
a "third vehicle."
42 U.S.C. 7507.

-5-
5

regulations, except for California, which may enact fuel

standards without EPA approval. Id. 7545(c)(4)(B).

-6-
6

B. DEP's Adoption of California LEV Regulations

In September 1991, California enacted a novel set

of vehicle emissions and clean fuels requirements called the

"Low Emissions Vehicles/Clean Fuels" (LEV/CF) program. The

LEV component of the program requires the creation of four

categories of California cars to meet increasingly stringent

emissions standards, to be phased in over time: Transitional

Low-Emission Vehicles; Low-Emission Vehicles; Ultra-Low-

Emission Vehicles; and Zero-Emission Vehicles, such as

electric cars. California has also established annually

descending "fleet average requirements," based on sales

targets for each category of vehicles. A fleet average

requirement is a cap on the average emissions attributable to

all classes of vehicles produced by a particular manufacturer

in a given year (in other words, the manufacturer's "fleet").

California's requirements provide manufacturers with

"flexibility to develop varying emissions within their entire

fleet to meet [an] overall goal." MVMA, 17 F.3d at 535. On

January 7, 1993, EPA granted California a 209(b) waiver for

the program.

Meanwhile, on January 31, 1992, DEP adopted the LEV

component of California's standards, intending to apply the

standards beginning with 1995 models. DEP regulations allow

new California cars to be leased, bought, sold, and

registered in Massachusetts, but ban the acquisition, sale,

-7-
7

and registration of new federal cars in the state. DEP's

proposed regulations sent out for notice and comment

contained fleet average requirements, but no such

requirements appear in the final rule because DEP preferred

to let the market determine the mix of new California cars in

the state.

C. Prior Proceedings

Plaintiffs filed an action in the District Court

for the District of Massachusetts, arguing that DEP's

regulations are preempted by the Act because DEP allegedly

failed to comply with 177 of the Act, 42 U.S.C. 7507.

Plaintiffs moved for summary judgment and for a preliminary

injunction, founding their motions on four claims: [1] the

regulations are not "identical" to California's, in that DEP

did not adopt California's clean fuels rules; [2] the

regulations force manufacturers to create a "third vehicle"

because of the higher sulfur content of gasoline in

Massachusetts; [3] the regulations were adopted by DEP before

EPA granted California a 209(b) waiver; and [4] the two-

year leadtime requirement precluded DEP from applying the

regulations to any 1995 models because two automakers planned

to begin producing 1995 cars before two years passed after

the regulations were adopted.

With the parties' consent, the court stayed the

summary judgment proceedings and ruled first on the motion

-8-
8

for a preliminary injunction. The court denied the motion

without a hearing, ruling that while plaintiffs demonstrated

a risk of irreparable injury given the cost of vehicle

emissions controls, the balance of equities and the risk of

harm to the public interest did not clearly favor granting an

injunction. The court also found that plaintiffs failed to

demonstrate a likelihood of prevailing on the merits, which

is the "sine qua non" of the preliminary injunction test.

Weaver v. Henderson, 984 F.2d 11, 12 & n.3 (1st Cir. 1993).

Three of the four Clean Air Act issues presented to

the district court were later addressed by the Second Circuit

in a case concerning a challenge to New York's adoption of

the LEV standards. See MVMA, 17 F.3d at 521, aff'g in part

and rev'g in part Motor Vehicle Mfrs. Ass'n v. New York Dep't

of Envtl. Conservation, 831 F. Supp. 57 (N.D.N.Y. 1993)

(hereinafter New York DEC). The Second Circuit held in favor

of the state on the identicality and waiver claims, but held

in favor of the automakers on the leadtime claim. Id. at

532-35. The court did not consider the merits of the "third

vehicle" claim because the district court found material

facts at issue and set the claim down for trial. Id. at 530.

II.

PARTIAL DISMISSAL

Prior to oral argument, plaintiffs moved under Fed.

R. App. P. 42(b) to dismiss their appeal as to the

-9-
9

identicality, waiver, and third vehicle claims, thereby

leaving the leadtime issue as the sole basis for interim

relief. Plaintiffs' action was prompted by the Second

Circuit's adverse ruling on the identicality and waiver

claims, which came after plaintiffs' opening brief was filed

in this case. In addition, plaintiffs maintain that the

third vehicle claim requires testimony on the effects of

sulfur on emissions systems, and that the evidence in the

record is outdated and incomplete.

We have broad discretion to grant voluntary motions

to dismiss. "An appeal may be dismissed on motion of the

appellant upon such terms as may be . . . fixed by the

court." Fed. R. App. P. 42(b); see also 16 Charles A. Wright

& Arthur R. Miller, Federal Practice and Procedure 3988, at

480 (1977). Such motions are generally granted, but may be

denied in the interest of justice or fairness. See HCA

Health Servs. of Virginia v. Metropolitan Life Ins. Co., 957

F.2d 120, 123 (4th Cir. 1992); United States v. Washington

Dep't of Fisheries, 573 F.2d 1117, 1118 (9th Cir. 1978).

DEP contends that this case "presents one of the

rare occasions where justice requires that a voluntary motion

to dismiss be . . . denied," so that we might rule that the

third vehicle claim fails as a matter of law. We are

unpersuaded. None of the grounds that have compelled courts

-10-
10

to deny voluntary motions to dismiss are present here. See,

e.g., Township of Benton v. County of Berrien, 570 F.2d 114,

118-19 (6th Cir. 1978) (denying motion to dismiss filed by

one of two appellants because dismissal "would be a

meaningless gesture," where both appellants pressed same

arguments, and both would be affected by decision); Blount v.

State Bank & Trust Co., 425 F.2d 266, 266 (4th Cir. 1970)

(denying appellant's motion to dismiss, but granting

appellee's because appellant violated briefing schedule and

caused appellee to file motion to dismiss); Local 53, Int'l

Ass'n of Heat and Frost Insulators v. Vogler, 407 F.2d 1047,

1055 (5th Cir. 1969) (denying motion and affirming on the

merits because motion to dismiss was based on unsound

argument that appeal from injunction was moot since appellant

was voluntarily refraining from enjoined conduct); see also

Washington Dep't of Fisheries, 573 F.2d at 1118 (courts

"might have grounds" for denying motion to dismiss if sought

to evade appellate review and to frustrate court orders).

Furthermore, we note that granting the Rule 42(b)

motion will not shelter the remaining claims from scrutiny.

We will simply be accepting plaintiffs' decision to let those

claims be finally adjudicated before bringing them to this

court. Creaton v. Heckler, 781 F.2d 1430, 1431 (9th Cir.

1986). The interests of fairness and judicial economy are

well served by restricting our review to the leadtime issue,

-11-
11

the sole claim both parties concede we must decide.

Consequently, we grant the motion for partial dismissal and

decline to reach the merits of the third vehicle claim.

-12-
12

III.

LEADTIME

We turn to whether the district court was correct

in denying a preliminary injunction based on the leadtime

claim. We will reverse only if the district court abused its

discretion or made a manifest error of law. Narragansett

Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir. 1991).

At issue is the proper construction of the leadtime

requirement. The statute at issue, 177 of the Clean Air

Act, 42 U.S.C. 7507, empowers states to adopt and enforce

California emissions standards for vehicles and motor vehicle

engines "for any model year," if the state adopts such

standards "at least two years before commencement of such

model year (as determined by regulations of the [EPA]

Administrator)."2 The parties agree that the model year

2. Section 177 states, in pertinent part:
Notwithstanding [the statute preempting
state emissions regulations], any State
which has plan provisions [for the
attainment and maintenance of the NAAQS]
may adopt and enforce for any model year
standards relating to control of
emissions from new motor vehicles or new
motor vehicle engines . . . if --
(1) such standards are identical to the
California standards for which a waiver
has been granted for such model year, and
(2) California and such State adopt such
standards at least two years before
commencement of such model year (as
determined by regulations of the
Administrator).
42 U.S.C. 7507.

-13-
13

designation of any particular vehicle depends on when that

model or engine was produced. According to EPA, a model year

is either the calendar year, or the manufacturer's production

period, lasting no longer than a day less than two years,

i.e., from January 2 of the preceding year through December

31 of the calendar year for which the model year is named.

40 C.F.R. 86.082-2 ("model year" means calendar year or

"the manufacturer's annual production period (as determined

by the [EPA] Administrator)"); EPA, Office of Mobile Sources,

Advisory Circular 6B (1987) (hereinafter Advisory Circular

6B) (defining annual production period).3

The parties dispute whether or not the leadtime

requirement applies on an industry-wide basis. According to

plaintiffs, all 1995 models sold in Massachusetts must be

federal cars because GM and Chrysler began producing 1995

models prior to January 31, 1994. In other words, the model

3. Advisory Circular 6B states, in pertinent part:
The "annual production period" for any
specific model within an engine family of
light-duty vehicles or heavy-duty engines
begins either: (1) when such vehicle or
engine is first produced, or (2) on
January 2 of the calendar year preceding
the year for which the model year is
designated, whichever date is later. The
annual production period ends either:
(1) when the last such vehicle or engine
is produced, or (2) on December 31 of the
calendar year for which the model year is
named, whichever date is sooner.

-14-
14

year began less than two years after the LEV standards were

adopted.

Basing its interpretation on Advisory Circular 6B,

with support from EPA's amicus brief, DEP demurs, maintaining

that the leadtime requirement is satisfied as to any model in

an "engine family" first produced after January 31, 1994.

The record indicates that an "engine family" is a

classification used to group together vehicles that have the

same emissions control design. DEP's standards would apply

only to models or engine families first produced after

January 31, 1994. Plaintiffs characterize DEP's

interpretation as "splitting" the model year because the 1995

standards would apply to some, but not all 1995 cars.

The district court's position approximated DEP's

(and EPA's): "`The failure to provide the statutory leadtime

to a particular manufacturer for a particular model year does

not invalidate the standards themselves. Instead, it merely

renders them unenforceable as against those manufacturers

which were not given the requisite two-years notice.'"

American Automobile Mfrs. Ass'n v. Greenbaum, No. 93-10799-

MA, slip op. at 23 (D. Mass. Oct. 27, 1993) (quoting New York

DEC, 831 F. Supp. at 64 (emphasis in original)). The court

did not rule on whether each engine family has a different

model year commencement date, but noted that Advisory

-15-
15

Circular 6B "seems to support DEP's understanding." Id. at

23 n.20.

Plaintiffs' industry-wide date for the commencement

of the model year prevailed in the Second Circuit. That

court held that EPA's position was not entitled to deference

because it was "newly minted" for litigation and was not

embodied in a regulation under 177. MVMA, 17 F.3d at 535.

Moreover, the court found an industry-wide date to be

consistent with Congressional intent, while EPA's

interpretation was unprecedented and "unreasonable" because

it would be confusing to the industry and impractical to

enforce. Id. at 535-36. Plaintiffs urge us to follow the

Second Circuit. We decline to do so.

In the first place, we are not confronted with a

regulatory program identical to that at issue in the Second

Circuit. New York, like California, but unlike

Massachusetts, imposed fleet average requirements to

determine the mix of vehicles sold in the state each year.

The Second Circuit determined that the leadtime provision was

"best read" with an industry-wide commencement date because

splitting the year would "unduly complicate the fleet

averaging plan." MVMA, 17 F.3d at 535. Manufacturers would

be unable to buy and sell emissions credits to meet the

requirements because some of them would have to comply with

1995 standards, but others would not. Id. We agree with the

-16-
16

Second Circuit that fleet averaging might be more complicated

in the first year that California-type standards are

effective in a 177 state, but we discount the significance

of that consideration. Fleet averaging for emissions

programs is a concept devised by California, not Congress.

Although the Second Circuit found fleet averaging to be the

"crux" of the LEV plan, id., neither party in this case has

argued that under 177, states must adopt fleet average

requirements.4 Accordingly, the extent to which a split

model year interpretation unduly complicates the

administration of fleet averaging is not a pertinent

consideration.

Furthermore, we do not agree with the Second

Circuit's characterization of EPA's definition as having been

"newly minted" for litigation. EPA did not develop its

interpretation during litigation. Rather, the agency issued

Advisory Circular 6B in 1987, while New York and

Massachusetts adopted California's requirements in 1992. And

in a letter dated March 8, 1991, to Congressman John Dingell

(D. Mich.), the EPA Administrator cited Advisory Circular 6B

for the premise that "a state adopting California emissions

standards may apply these standards to any engine family

4. The automakers' position during DEP's notice and comment
period for the LEV program (which originally included a fleet
averaging scheme) was that fleet averaging violates the third

vehicle provision by restricting a manufacturer's ability to
sell California cars in the state.

-17-
17

whose production period begins on a date which is beyond two

years past the date that the standards were adopted . . . ."

It is significant that EPA's interpretation did not spring

from a litigator's self-spun argument, but arose prior to

litigation, and was expressed by the Administrator in a

letter to a member of Congress from Michigan. See Federal

Labor Relations Auth. v. United States Dep't of Navy, 941

F.2d 49, 59 (1st Cir. 1991) (deferring to agency

interpretation first announced in amicus brief and later

adopted as "official" agency position by agency director in

unpublished letter); cf. Martin v. Occupational Safety and

Health Review Comm'n, 111 S. Ct. 1171, 1179 (1991) ("Our

decisions indicate that agency `litigating positions' are not

entitled to deference when they are merely appellate

counsel's `post hoc rationalizations' for agency action,

advanced for the first time in the reviewing court.").

Based on the statutory requirement that "model

year" be determined by EPA regulations, the Second Circuit

held that Congress intended that EPA would promulgate a

regulation defining "model year" under 177. MVMA, 17 F.3d

at 535. We disagree. We find that a regulatory definition

predating 177 satisfies the statute. Congress's use of the

passive voice indicates that an existing regulatory

definition would suffice. Compare 177, 42 U.S.C. 7507

("as determined by regulations of the Administrator") with,

-18-
18

e.g., id. 7521(a)(1) ("the Administrator shall" by

regulation prescribe federal auto emission requirements). In

1970, Congress passed 42 U.S.C. 7521(b)(3)(A), which

defines "model year," for the purposes of the federal

emissions control program, as the "calendar year," or "the

manufacturer's annual production period (as determined by the

[EPA] Administrator) which includes January 1 of such

calendar year. . . ." The regulatory definition of model

year in effect when 177 was enacted tracked that

definition: "`Model year' means [the calendar year, or] the

manufacturer's annual production period (as determined by the

Administrator) which includes January 1 of such calendar year

. . . ." 40 C.F.R. 86.082-2.

We also reject the Second Circuit's finding that

Congress could not have contemplated that the leadtime

provision might apply on an engine-family basis. MVMA, 17

F.3d at 535. We note first that what Congress "contemplated"

is of limited relevance, given that EPA was expressly

authorized to define when the model year commences.

Moreover, since 1972, EPA has issued advisory circulars

describing how to determine the model year "for any specific

model within an engine family." E.g., Advisory Circular 6A,

at 2 (Sept. 1, 1972). And while EPA has never implemented a

split model year in the federal emissions control program, we

do not place great weight on this. There are relatively few

-19-
19

leadtime provisions in the Clean Air Act emissions control

program. Because states with 177 programs are, by

definition, encountering significant air pollution problems,

and because Congress expressly delegated to EPA the power to

define model year under 177, EPA may identify policy

considerations allowing it to construe the leadtime

provisions in the federal program differently from 177.

See Comite pro Rescate de la Salud v. Puerto Rico Aqueduct

and Sewer Auth., 888 F.2d 180, 187 (1st Cir. 1989) ("[W]here

the reason for the court's `deference' reflects its belief

that Congress, in effect, delegated to the agency a degree of

interpretive power, it does not seem odd to find the agency

interpreting the same words somewhat differently as they

apply to different parts of the statute in order better to

permit that statute to fulfill its basic congressionally

determined purposes." (emphasis in original)), cert. denied,

494 U.S. 1029 (1990).

On the other hand, one might argue that a court

owes EPA's interpretation no deference because the statute

requires EPA to define "model year" by "regulation," while

EPA's definition is found not in a regulation, but in a

policy statement (Advisory Circular 6B). See MVMA, 17 F.3d

at 535 ("Section 177 charges the EPA with the single, narrow

responsibility to issue `regulations' in order to define the

commencement of a model year under 177. The EPA Advisory

-20-
20

Circular . . . is not a `regulation' for 177 purposes and

was not promulgated specifically to implement this provision

. . . ."). Plaintiffs failed to make such an argument to the

district court and compounded that error by omitting the

point from their opening brief.5 See McCoy v. MIT, 950 F.2d

13, 22 (1st Cir. 1991) ("It is hornbook law that theories not

raised squarely in the district court cannot be surfaced for

the first time on appeal."), cert. denied, 112 S. Ct. 1939

(1992); see also Frazier v. Bailey, 957 F.2d 920, 932 n.14

(1st Cir. 1992) (arguments raised only in reply brief are

insufficient to preserve claim on appeal). Until filing

their reply brief in this court, plaintiffs failed to assert

that no EPA definition of model year existed for the purposes

of 177, and in fact cited Advisory Circular 6B and 40

C.F.R. 86.082-2 to the district court for the premise that

the model year began on January 2, 1994. See, e.g.,

Plaintiff's Mem. of Law in Support of Mot. for S.J., at 44;

First Amended Complaint 55 ("As defined by EPA's

regulations, the 1995 model year commences as early as

January 2, 1994. See 40 C.F.R. 86-082-2 (1992); EPA Office

of Mobile Sources Circular 6B (1987).").

5. Plaintiffs argued below and in their opening brief that
Congress's use of the terms "commencement" and "model year"
in the singular foreclosed a "split" model year, that such an
interpretation would have adverse effects on the industry,
and that EPA had never used a split model year in the federal
emissions control program.

-21-
21

We have recognized an exception to the raise-or-

waive rule where the argument surfacing for the first time on

appeal is "`so compelling as virtually to insure appellant's

success,'" and a "`gross miscarriage of justice'" would

result from our failure to address it. Johnston v. Holiday

Inns, Inc., 595 F.2d 890, 894 (1st Cir. 1979) (citations

omitted); accord United States v. Slade, 980 F.2d 27, 31 (1st

Cir. 1992). The argument here is not so compelling as to

assure plaintiffs' success. EPA's interpretation of 177

would be entitled to some weight, where EPA administers the

federal emissions program and is charged with evaluating

whether state plans for meeting the NAAQS are consistent with

the Act. See 42 U.S.C. 7410(k)(3).

Furthermore, plaintiffs do not contend that our

failure to consider the argument would cause a gross

miscarriage of justice. Nor could they so contend. In the

first place, this is an interlocutory appeal; plaintiffs may

raise the argument in the district court before issues

pertaining to the 1995 requirements become moot, because the

model year for any vehicle lasts until December 31, 1995. In

addition, this is not a case in which an appellant might lose

her home, see United States v. One Urban Lot, 885 F.2d 994,

1001-02 (1st Cir. 1989), or a prisoner might remain

incarcerated, see United States v. La Guardia, 902 F.2d 1010,

1013 (1st Cir. 1990), if we deem the issue waived. And

-22-
22

though the question before us, concerning the earliest date

vehicles outside California might be subject to California-

type emissions standards, is certainly one of interest to the

public, the degree of public interest pales in contrast with

that involved when the federal government's right to

prosecute suspected criminals is at issue, e.g., United

States v. Krynicki, 689 F.2d 289, 292 (1st Cir. 1982). These

cases show the gulf that exists between the prospective harm

here and the type of harm that permits serious consideration

of relaxing the raise-or-waive rule, within the reviewing

court's discretion. Accordingly, we find the argument waived

for the purposes of this appeal.

Assuming, therefore, that the regulatory definition

of model year required by 177 is embodied in Advisory

Circular 6B, we next inquire whether EPA's interpretation is

arbitrary, capricious, or manifestly contrary to the statute.

Chevron U.S.A., Inc. v. Natural Resources Defense Council,

467 U.S. 837, 843-44 (1984). Such deference is due because

Congress explicitly delegated to EPA, the agency responsible

for administering the federal emissions program, the task of

defining model year under 177.

Plaintiffs argue that applying the leadtime

requirement to individual models or engine families

contradicts Congress's intent made manifest by the statute's

use of the terms "commencement" and "model year" in the

-23-
23

singular. We disagree. At best, the statutory language is

ambiguous with respect to whether the leadtime requirement

might apply on an industry-wide or engine-family-specific

basis. See 42 U.S.C. 7507 (State "may adopt and enforce

[standards] for any model year . . . if-- . . . California

and such State adopt such standards at least two years before

commencement of such model year . . . ."). An examination of

other leadtime provisions enacted in 1977 for the Act's

federal emissions program does not clarify the issue because

those provisions generally pertain to heavy duty engines,

whose model year commencement date, according to the record,

is always January 1 of the calendar year. Moreover, those

provisions could be read with either an industry-wide model

year commencement date, or separate dates for different

engine families. E.g., 42 U.S.C. 7521(a)(3)(E)(ii) (1988)

("No such changed standard shall apply for any model year

before the model year four years after the model year during

which regulations containing such changed standard are

promulgated.") (repealed in 1990).

Moreover, the legislative history of 177 is

generally unenlightening.6 Congress clearly enacted the

6. Plaintiffs, in a footnote, quote a 1990 statement of
Senator Nickles:
If a State follows the necessary
procedures, California standards can take
effect in the first model year commencing
2 model years after the State has adopted
the California standards. Thus, a State

-24-
24

leadtime provision for the manufacturers' benefit. H.R. Rep.

No. 294, 95th Cong., 1st Sess. 310 (1977) ("Manufacturers are

not only assured of identity of standards and test

procedures; they are also assured adequate lead time."); see

also MVMA, 17 F.3d at 535. Although plaintiffs would prefer

that all 1995 cars be subject to the same regulatory

requirements, that is not necessarily the import of that

statement of legislative intent. EPA's interpretation grants

every manufacturer two years to develop emissions controls

and to devise marketing and distribution strategies for any

new vehicle or engine family subject to California-type

standards. There is no inherent conflict between EPA's

interpretation and Congress's intent.7

Plaintiffs maintain that EPA's interpretation does

not reflect a reasonable policy determination because it

would cause "enormous competitive and practical problems," in

that California-type requirements would apply to some 1995

that adopted fully waived California
standards in November 1992 could, for
example, have those standards take effect
beginning in model year 1996.
136 Cong. Rec. S18274 (daily ed. Nov. 2, 1990). The leadtime
provision was enacted in 1977 and was not amended in 1990.
We give little weight to the remarks of a single member of
Congress, made thirteen years after a statute is passed, in
divining legislative intent.

7. DEP notes that EPA's interpretation has one salutary
effect for the industry: each manufacturer could determine,
from its own production schedules, not the schedules of
others, whether to produce federal or California cars for the
first year in which California-type standards are in effect.

-25-
25

vehicles, while the remainder would be subject to federal

standards. Appellants' Br. at 46. According to plaintiffs,

this split would cause dealer and consumer confusion, the

disruption of vehicle distribution systems, and competitive

disadvantages for some dealers and manufacturers. DEP

argues, however, that these concerns are overstated, given

the widespread use of computerized inventory controls. Also,

on the other side of the balance is the state's interest in

applying California requirements to some models as soon as

possible. Any vehicle subject to regulatory controls will be

subject to those controls for the vehicle's useful life.

Conversely, vehicles escaping the controls may travel over

Massachusetts highways for years emitting pollutants in

excess of California standards. Whether EPA's interpretation

imposes greater costs than benefits is a policy

determination. "When Congress, through express delegation or

the introduction of an interpretive gap in the statutory

structure, has delegated policy making authority to an

administrative agency, the extent of judicial review of the

agency's policy determinations is limited." Pauly v.

Bethenergy Mines, Inc., 111 S. Ct. 2524, 2534 (1991). We

will reject the agency's interpretation only if it is

arbitrary or illegal. It is neither. Accordingly, based on

the assumption that Advisory Circular 6B provides a

-26-
26

regulatory definition of "model year" for the purposes of

177, we conclude that the leadtime requirement was satisfied.

The likelihood of success on the merits is a

predicate to the issuance of a preliminary injunction.

Plaintiffs failed to establish such a likelihood. Moreover,

plaintiffs "have not persuaded us that the lower court

overlooked pertinent factors, focused on inappropriate

factors, or made a serious error in weighing and balancing

the relevant concerns." Weaver, 984 F.2d at 14. Therefore,

we hold that the district court did not abuse its discretion

in refusing to enjoin the 1995 standards.

-27-
27

IV.

COSTS AND FEES

DEP argues that it is entitled to costs and

attorney's fees. Prevailing parties are normally entitled to

costs. Fed. R. App. P. 39; 9 James W. Moore et al., Federal

Practice 239.02[1], at 39-6 to -7 (2d ed. 1994).8 And

costs are routinely available whenever this court dismisses

an appeal, even if the appellant moved for dismissal. See

Waldrop v. Department of Air Force, 688 F.2d 36, 37 (7th Cir.

1982).

On the other hand, DEP's argument for attorney's

fees must be rejected. DEP seeks reimbursement for legal

fees incurred in responding to the appeal on the claims that

were dismissed pursuant to Rule 42(b). Neither Rule 42(b)

nor Rule 39 provides authority for routine awards of

attorney's fees as a condition of voluntary dismissal.

Waldrop, 688 F.2d at 37-39. While fees may be awarded if an

appellant has filed a frivolous appeal or has acted in bad

faith, see Cruz v. Savage, 896 F.2d 626, 631-32, 635 (1st

Cir. 1990), we find no evidence of such conduct here. We are

8. Rule 39 states:
Except as otherwise provided by law, if
an appeal is dismissed, costs shall be
taxed against the appellant unless
otherwise . . . ordered by the court; . .
. if a judgment is affirmed or reversed
in part, or is vacated, costs shall be
allowed only as ordered by the court.

-28-
28

unpersuaded by DEP's attempt to characterize the weeks that

transpired between the issuance of the Second Circuit opinion

and the motion for partial dismissal as evidence of

plaintiffs' vexatiousness. It takes time to evaluate a new

opinion, and to confer with the client on an appropriate

strategy.

V.

CONCLUSION

For the foregoing reasons, we grant the motion for

partial dismissal and affirm the district court's decision

not to enjoin the 1995 requirements based on plaintiffs'

leadtime claim. Costs to DEP.

It is so ordered.

-29-
29