**UNITED STATES of America,**
**Plaintiff–Appellant,**

v.

**GENERAL DYNAMICS CORPORATION,**
**Defendant–Appellee.**

**No. 1786, Docket 93–6002.**

United States Court of Appeals,
Second Circuit.

Argued June 17, 1993.

Decided March 17, 1994.

---

David A. Koenigsberg, Asst. U.S. Atty. for the S.D. of N.Y., New York City (Roger S. Hayes, U.S. Atty. for the S.D. of N.Y., Nancy L. Savitt, Beth A. Kaswan, Richard W. Mark, Gabriel W. Gorenstein, Asst. U.S. Attys. for the S.D. of N.Y., New York City, of counsel), for plaintiff-appellant.

David W. DeBruin, Jenner & Block, Washington, DC (Nicholas D. Chabraja, David C. Bohan, Jenner & Block, Washington, DC, of counsel), for defendant-appellee.

Before: CARDAMONE and MAHONEY, Circuit Judges, and CEDARBAUM, District Judge.*

MAHONEY, Circuit Judge:

Plaintiff-appellant, the United States, appeals from a judgment entered October 5, 1992 in the United States District Court for the Southern District of New York, Kenneth Conboy, *Judge*, that dismissed its claims against General Dynamics Corporation ("GD").[1] The judgment is supported by a thorough and comprehensive opinion, familiarity with which is assumed. *See United States v. Davis*, 803 F.Supp. 830 (S.D.N.Y. 1992).

This case involves the Construction Differential Subsidy program established under Title V of the Merchant Marine Act of 1936, as amended, 46 App.U.S.C. §§ 1151–1161, which is designed to encourage ship purchasers to place their orders for ship construction with American rather than foreign shipyards. Under this program, the Secretary of Transportation provides a construction differential subsidy ("CDS") in the amount of the differential between a competitively bid price or (as in this case) a price negotiated with an American shipyard for the construction of a ship, and the estimated cost of building the ship under similar plans and specifications in a representative foreign shipyard.

Section 1152(a) requires that "the proposed ship purchaser and the shipyard submit backup cost details and evidence that the negotiated price is fair and reasonable." The main theme of the government's complaint in this action is that GD submitted false cost data and estimates in the summer of 1976 to the United States Maritime Administration ("MarAd") in support of CDS applications with respect to the construction of two ships designed to carry liquified natural gas (the "Vessels"). Except as specified in the following paragraph of this opinion, we affirm the

---

* The Honorable Miriam Goldman Cedarbaum, United States District Judge for the Southern District of New York, sitting by designation.

1. The third amended complaint in this action named four individual defendants, as well as GD. The action was dismissed without prejudice against one of the individual defendants, a default judgment was entered against another, and summary judgment was entered against the other two. Accordingly, this appeal, as well as the judgment from which it is taken, deals only with the claims of the United States against GD.

dismissal of the government's claims on the basis of the district court's opinion. *See* 803 F.Supp. at 860–65.

Based upon federal common law and the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729–3731, the government sought damages resulting from kickbacks paid to GD employees by Frigitemp Corporation ("Frigitemp") to procure subcontracts for work on the Vessels.[2] Although the Anti–Kickback Act of 1946 (the "AKA"), ch. 80, 60 Stat. 37 (1946), as amended at the time of the events at issue in this litigation,[3] provided no remedy to the government against prime contractors such as GD, the district court nonetheless held that the AKA preempted any other federal remedies against GD. The court accordingly dismissed the claims premised upon the alleged Frigitemp kickbacks (the "Frigitemp Claims"). *See* 803 F.Supp. at 865–71. We reverse and remand on this issue.

Accordingly, we affirm in part and reverse and remand in part.

## Background

We set forth only those facts relevant to the Frigitemp Claims. GD, through its Quincy Shipbuilding Division ("Quincy"), awarded subcontracts for sphere insulation and joiner work on the Vessels to Frigitemp. P. Takis Veliotis, a defendant in this action, was the general manager of Quincy from 1973 to October 1977. For purposes of this appeal, we accept that Veliotis arranged for Frigitemp to be awarded the subcontracts in

return for kickbacks to be paid by Frigitemp to Veliotis and another Quincy official, defendant James H. Gilliland. *See supra* note 2. The United States alleges that GD passed the costs of the kickbacks on to the government by including the kickbacks in the cost estimates for the Vessels that GD submitted to MarAd. The government claims that the CDS's paid to GD were wrongfully inflated, and seeks recovery against GD for consequential damages under the FCA and federal common law.

The district court conducted a bench trial of this case from December 10, 1991 to March 10, 1992. The court dismissed the complaint as to all claims against GD. With respect to the Frigitemp Claims, the court held that "the Anti–Kickback Act preempts the Government's statutory and common law claims with respect to the Frigitemp kickbacks." 803 F.Supp. at 871.

This appeal followed.

## Discussion

■ The United States seeks recovery against GD for excess CDS's paid to GD resulting from false submissions made by GD to MarAd incorporating the Frigitemp kickbacks into GD's cost data. The government argues that under the FCA and federal common law, it is entitled to recover any amounts paid out due to false claims. The FCA provides a statutory remedy for recovery by the government of damages caused by fraud. The Supreme Court has described the FCA as

---

2. The district court made factual findings that Frigitemp paid kickbacks to GD officers in return for being awarded subcontracts with respect to the Vessels, citing GD's claim to that effect in a lawsuit it filed against a former GD officer named as a defendant in this case, P. Takis Veliotis. *See* 803 F.Supp. at 859. In addition, one of the individual defendants in this case, George G. Davis, a former officer of Frigitemp, was convicted on November 1, 1984 of criminal charges arising out of the alleged kickback scheme. *See United States v. Davis*, 767 F.2d 1025, 1026–27 (2d Cir.1985) (affirming conviction).

3. The current version of the AKA is codified at 41 U.S.C. §§ 51–58 (1988). The version of the AKA applicable to the events at issue in this case, the original AKA as amended by Pub.L. No. 86–695,

74 Stat. 740 (1960), and codified at 41 U.S.C. §§ 51–54, prohibited "[t]he payment of any fee, commission, or compensation of any kind or the granting of any gift or gratuity of any kind, either directly or indirectly, by or on behalf of a subcontractor," § 51, and provided civil and criminal penalties only against subcontractors and individual recipients of kickbacks, but not against prime contractors. §§ 51, 54. The AKA was completely revised in 1986, and now provides for a civil remedy directly against a prime contractor "whose employee, subcontractor or subcontractor employee violates section 53 of [title 41] by providing, accepting, or charging a kickback." 41 U.S.C. § 55(a)(2) (1988). However, the 1986 revision of the AKA applies only prospectively. *See* Anti–Kickback Enforcement Act of 1986, Pub.L. No. 99–634, § 3(a), 100 Stat. 3523, 3526 (1986).

intended to reach all types of fraud, without qualification, that might result in financial loss to the Government. In its present form the Act is broadly phrased to reach any person who makes or causes to be made "any claim upon or against" the United States, or who makes a false "bill, receipt, ... claim, ... affidavit or deposition" for the purpose of "obtaining or aiding to obtain the payment or approval of" such a false claim. In the various contexts in which questions of the proper construction of the Act have been presented, the Court has consistently refused to accept a rigid, restrictive reading, even at the time when the statute imposed criminal sanctions as well as civil.

*United States v. Neifert–White Co.,* 390 U.S. 228, 232, 88 S.Ct. 959, 961–962, 19 L.Ed.2d 1061 (1968) (citation and footnotes omitted). In addition, the government's common law right to recover funds wrongfully paid is well established. *See, e.g., Safir v. Gibson,* 417 F.2d 972, 977 (2d Cir.1969) (recovery of subsidies paid by federal government permitted under common law principles in absence of statutory prohibition).

■ GD argues that any remedy that might otherwise be available to the government under federal law is preempted by the AKA. The issue is whether a remedial scheme provided by one federal statute, the AKA, precludes remedies potentially available to the government under both a previously enacted federal statute, the FCA, and federal common law. The district court concluded that the AKA provides the exclusive federal remedy for damages resulting from kickbacks. We review the district court's resolution of this issue *de novo. See United States v. Edwards,* 960 F.2d 278, 281 (2d Cir.1992) (district court's construction of federal statutes subject to *de novo* review).

The Supreme Court recently decided a similar issue in *Connecticut National Bank v. Germain,* —— U.S. ——, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992). In *Germain,* the question presented was whether an interlocutory order of a district court sitting as a court of appeals in bankruptcy was appealable to the appropriate court of appeals under 28 U.S.C. § 1292(b) (1988) in view of the provisions of 28 U.S.C. § 158(d) (1988). *See* —— U.S. at ——, 112 S.Ct. at 1148. Section 1292 vests the circuit courts with appellate jurisdiction over certain interlocutory orders of the district courts. Germain argued that because § 158(d), a jurisdictional statute specifically tailored to bankruptcy appeals, does not provide for circuit court jurisdiction over interlocutory orders of the district courts sitting as courts of appeals in bankruptcy, § 158(d) must be read to preclude appellate jurisdiction over interlocutory orders in this limited category of cases that would otherwise be provided by § 1292. *See* —— U.S. at ——, 112 S.Ct. at 1148.

Explicating the central role of § 158 with respect to the issue of jurisdiction in bankruptcy appeals, the Court stated:

Bankruptcy appeals are governed for the most part by 28 U.S.C. § 158. This section comprises four subsections, three of which concern us here. Subsection (a) gives the district courts authority to hear appeals from final and interlocutory orders of the bankruptcy courts.... Subsection (b) permits the judicial council of any circuit to establish a bankruptcy appellate panel to fill the role of the district courts under subsection (a). Subsection (d), which is pivotal in this case, provides:

"The courts of appeals shall have jurisdiction of appeals from all final decisions, judgments, orders, and decrees entered under subsections (a) and (b) of this section."

*Germain,* —— U.S. at ——, 112 S.Ct. at 1148 (quoting § 158(d)).

The Court nonetheless concluded that although § 158(d) provides only for appellate jurisdiction over final orders of district courts sitting as courts of appeals in bankruptcy, nothing in § 158 precludes the application of § 1292, which grants the circuit courts general jurisdiction over interlocutory orders of district courts, to authorize appeals of such orders from district courts sitting as courts of appeal in bankruptcy. *See* —— U.S. at —— – ——, 112 S.Ct. at 1149–1150. In reaching this conclusion, the Court noted that § 158(d) and 28 U.S.C. § 1291 (1988), the companion provision to § 1292 that provides general appellate jurisdiction to courts

ion of appeals over final decisions of the district courts, overlapped but were not entirely duplicative, because "each section confers jurisdiction over cases that the other section does not reach." —— U.S. at ——, 112 S.Ct. at 1149. The Court then stated: "Redundancies across statutes are not unusual events in drafting, and so long as there is no 'positive repugnancy' between two laws, a court must give effect to both." *Id.* (quoting *Wood v. United States,* 41 U.S. (16 Pet.) 342, 363, 10 L.Ed. 987 (1842)).

■ The ruling in *Germain* is consistent with well established jurisprudence that strongly disfavors preemption of federal statutory law by another federal statute absent express manifestations of a preemptive intent. " 'It is, of course, a cardinal principle of statutory construction that repeals by implication are not favored.' " *Radzanower v. Touche Ross & Co.,* 426 U.S. 148, 154, 96 S.Ct. 1989, 1993, 48 L.Ed.2d 540 (1976) (quoting *United States v. United Continental Tuna Corp.,* 425 U.S. 164, 168, 96 S.Ct. 1319, 1323, 47 L.Ed.2d 653 (1976)); *see also Morton v. Mancari,* 417 U.S. 535, 549–50, 94 S.Ct. 2474, 2481–83, 41 L.Ed.2d 290 (1974) (same) (collecting cases). *Radzanower* added, however, that there are

"two well-settled categories of repeals by implication—(1) where provisions in the two acts are in irreconcilable conflict, the later act to the extent of the conflict constitutes an implied repeal of the earlier one; and (2) if the later act covers the whole subject of the earlier one and is clearly intended as a substitute, it will operate similarly as a repeal of the earlier act. But, in either case, *the intention of the legislature to repeal must be clear and manifest....*"

426 U.S. at 154, 96 S.Ct. at 1993 (quoting *Posadas v. National City Bank,* 296 U.S. 497, 503, 56 S.Ct. 349, 352, 80 L.Ed. 351 (1936)) (emphasis added).

The district court did not refer to any of this authority in dismissing the Frigitemp Claims. Rather, the court placed its primary reliance upon *Jett v. Dallas Independent School District,* 491 U.S. 701, 730–36, 109 S.Ct. 2702, 2719–23, 105 L.Ed.2d 598 (1989), and *Brown v. General Services Administra-* tion, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), each of which held that a specific "precisely drawn, detailed statute preempt[ed] more general remedies." *Jett,* 491 U.S. at 734, 109 S.Ct. at 2722 (considering 42 U.S.C. § 1983); *Brown,* 425 U.S. at 834, 96 S.Ct. at 1968 (considering § 717 of the Civil Rights Act of 1964).

The district court invoked this statement, 803 F.Supp. at 865, and then added the following:

Moreover, the Supreme Court has held that when Congress states in a statute's legislative history that, outside that statute, Congress knows of no remedy to cure the ill which the statute was passed to cure, Congress' statement indicates that Congress intended the statute to create an exclusive remedy which preempts all other facially applicable remedies.

*Id.* (citing *Jett,* 491 U.S. at 734–35, 109 S.Ct. at 2721–22; *Brown,* 425 U.S. at 825–29, 96 S.Ct. at 1964–67). The Court then surveyed the legislative history of the AKA with respect to its original enactment in 1945, and its subsequent amendment in 1960 and 1986, concluding that the AKA preempted any remedy by the government against a prime contractor with respect to kickbacks until the 1986 amendments to the AKA provided such a remedy (as explained *supra* note 4). *See* 803 F.Supp. at 867.

We are not persuaded by this analysis. In the first place, we would be reluctant to glean a preemptive purpose from legislative history that is not supported by the language and structure of the statute. *See Germain,* —— U.S. at —— ——, 112 S.Ct. at 1149–50; *United States v. Johnson,* 14 F.3d 766, (2d Cir.1994). Further, both the initial passage of the AKA in 1945 and the strengthening amendments of 1960 and 1986 reflect a strong governmental policy disfavoring kickbacks. *See, e.g.,* H.R.Rep. No. 212, 79th Cong., 1st Sess. 2 (1945) ("The purpose of the [AKA] is to eliminate the practice of subcontractors of paying fees or kick-backs, or of granting gifts or gratuities, to employees of cost-plus-a-fixed-fee or cost-reimbursable prime contractors, or of higher tier subcontractors, for the purpose of securing the award of subcontracts or orders."). It would

be anomalous to conclude that legislation thus animated was intended by Congress to weaken or preclude the availability of other federal remedies in areas that the AKA concededly did not address. In both *Jett* and *Brown*, by contrast, the preempting legislation provided detailed remedies that occupied the field regarding practices as to which other remedies were preempted.

The district court ruled, however, that the relevant legislative history reveals a binding Congressional recognition that prior to the 1986 amendment of the AKA, there simply were no federal remedies other than the AKA that were available to address kickback practices. *See* 803 F.Supp. at 867. The most important evidence adduced for this position is a statement at the time of the AKA's original enactment that "[t]here is no existing statutory or other authority of law under which it may be said that the United States *clearly* has a right to recover the amounts of any *such* fees or gratuities." H.R.Rep. No. 212 at 3 (emphasis added). This statement was made in the context, however, of responding to an abuse described, in the immediately preceding passage, in these terms:

> [Congressional investigations had] revealed that gratuities or gifts ... had been given by certain concerns to individuals employed in the purchasing departments of the prime contractors in acknowledgment for orders previously given to the concerns through the influence of said individuals, or for the purpose of inducing the award of future orders by their influence. Since cost-plus-a-fixed-fee or cost reimbursable prime contractors are reimbursed by the United States for the cost of all subcontracts and purchase orders performed thereunder, the Government undoubtedly bears the ultimate cost of *such*

fees, commissions, and gratuities without receiving any benefit therefrom.

*Id.* at 2 (emphasis added).

The FCA did not "clearly" provide a remedy in 1946, when H.R.Rep. No. 212 was written, for the payment of "such fees, commissions, and gratuities" because they did not result in any direct claim to the government. Only subsequent case law and an amendment of the FCA in 1986 established a clear remedy under the FCA for such payments.[4] Thus, this legislative history provides no basis to bar the operation of the FCA in situations where it clearly *does* provide a remedy, as when a claim that is falsely inflated by kickback payments is directly submitted to the government by a prime contractor (such as GD).

A similar analysis applies to the government's common law claim. As the Supreme Court stated unanimously in *United States v. Wurts*, 303 U.S. 414, 58 S.Ct. 637, 82 L.Ed. 932 (1938): "The Government by appropriate action can recover funds which its agents have wrongfully, erroneously, or illegally paid. 'No statute is necessary to authorize the United States to sue in such a case. The right to sue is independent of statute....'" *Id.* at 415, 58 S.Ct. at 638 (footnote omitted) (quoting *United States v. Bank of the Metropolis*, 40 U.S. (15 Pet.) 377, 401, 10 L.Ed. 774 (1841)). We perceive no basis to conclude that the quoted legislative history undercuts this historically available remedy with respect to kickback-inflated payments made by the government to prime contractors.

The other legislative history that is cited as primary support for the district court's conclusion is a letter from the Comptroller General to the Attorney General that is included in H.R.Rep. No. 1880, 86th Cong., 2d Sess. 6 (1960), *reprinted in* 1960 U.S.C.C.A.N. 3292, 3297, which discusses a particular episode in which a sub-subcontrac-

---

4. The False Claims Amendments Act of 1986, Pub.L. No. 99–562, § 2, 100 Stat. 3153, 3154 (1986), added a new subsection (c) to 31 U.S.C. § 3729, which provides:

> For purposes of this section, "claim" includes any request or demand, whether under a contract or otherwise, for money or property which is made to a contractor, grantee, or other recipient if the United States Government provides any portion of the money or property which is requested or demanded, or if the Government will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded.

tor paid kickbacks to a subcontractor, neither of whom was in privity with or submitting claims to the United States. The district court quoted the following statement in that letter to support its finding of preemption: " '[W]e know of no Federal statute under which [those involved in the kickback activities] could be held amenable to the United States in a criminal or civil action for fraud unless the transaction in question may be said to come within the purview of the [AKA].' " 803 F.Supp. at 867 (quoting H.R.Rep. No. 1880 at 6, 1960 U.S.C.C.A.N. at 3297). This is the latter portion of a sentence, however, which begins: "Since the United States was not a party to the subcontracts [at issue], ..." H.R.Rep. No. 1880 at 6, 1960 U.S.C.C.A.N. at 3297, and then continues with the language quoted above. Thus, far from expressing an intent to preempt the application of the FCA as a remedy available to the United States with respect to prime contracts that are tainted by kickbacks, this legislative history implicitly recognizes the existence and availability of the FCA remedy in such cases.

We note also that the record of the hearings on the 1960 amendments to the AKA[5] includes a reprint of *United States v. Davio,* 136 F.Supp. 423 (E.D.Mich.1955), which held that the AKA was intended to apply retrospectively and could constitutionally be applied to kickbacks that were made before the enactment of the AKA, and stated:

> Out of an abundance of caution, and perhaps because it was doubtful of the efficacy of other remedies, Congress passed the [AKA], but recovery of the kickbacks is not dependent upon the validity or invalidity of the Act or any of its provisions.
>
> . . . .
>
> Procedurally, all the [AKA] does is to supplement existing procedures by giving the United States Government, in certain situations, a clear and direct procedural right to sue as party-plaintiff for the recovery of kickbacks. There is no constitutional invalidity in providing retrospectively a

supplemental procedural remedy for a previously existing remedy since defendants have no vested right in any particular mode of procedures.

*Id.* at 427–29 (footnote omitted).

Further, in *United States v. Acme Process Equipment Co.,* 385 U.S. 138, 87 S.Ct. 350, 17 L.Ed.2d 249 (1966), a unanimous Supreme Court ruled that the United States could rightfully cancel its contract with Acme, a prime contractor, because three of Acme's principal employees had accepted kickbacks for awarding related subcontracts in violation of the AKA. *See* 385 U.S. at 138–39, 148, 87 S.Ct. at 350–52, 356. The Court of Claims had ruled in favor of Acme on the basis that the only civil remedy provided by the AKA was the recovery of the kickback by the United States, and that Congress could have provided for the remedy of contract annulment had it so desired. *See id.* at 142–43, 87 S.Ct. at 353–54.

Reversing, the Supreme Court stated: "There is absolutely no indication in the legislative history of the [AKA] that Congress, in providing a civil remedy for a more tangible evil, intended to preclude other civil sanctions necessary to effectuate the purpose of the Act." *Id.* at 145, 87 S.Ct. at 355; *cf. Safir,* 417 F.2d at 978 n. 8 ("The grant to private citizens of a remedy that would not exist in the absence of specific authorization in no way precludes the availability of further relief consistent with the statutory scheme."). The Court also pointed out that kickbacks may result in consequential damages exceeding the amount of the kickbacks, or in the employment of unworthy or unqualified subcontractors, *see* 385 U.S. at 144–45, 87 S.Ct. at 354–55, neither of which problems were addressed by the AKA.

Finally, it is significant that courts have allowed the United States to seek recovery for kickbacks under the FCA or common law, without finding any preclusion of these remedies by the AKA. *See United States v. Killough,* 848 F.2d 1523, 1525–26 (11th Cir.1988) (recovery under FCA); *United States v. Kensington Hosp.,* 760 F.Supp. 1120, 1127–

---

5. *See Amending the "Anti–Kickback Statute": Hearings on H.R. 11465, H.R. 12496 & H.R. 12604 Before a Subcomm. of the House Comm. on* *Government Operations,* 86th Cong., 2d Session 19–22 (1960).

28, 1134–35 (E.D.Pa.1991) (recovery under FCA and common law); *United States v. Roter,* Civ. A. No. 89–1841, 1989 WL 63209, at *1 (E.D.Pa.1989) (recovery under FCA and for breach of fiduciary duty).

We conclude that the AKA does not preempt remedies of the United States under the FCA and federal common law with respect to CDS applications by GD whose cost data are tainted by kickback payments. The remedies available under the FCA and federal common law, we add, are not limited to the amount of the kickbacks, but extend to consequential damages resulting from the payment of kickbacks. *See Acme,* 385 U.S. at 144, 87 S.Ct. at 354–55.

The judgment of the district court regarding the Frigitemp Claims must therefore be reversed, and the matter remanded to the district court for further proceedings not inconsistent with this opinion. Upon remand, of course, the district court is free, in its discretion, to draw upon the evidence already provided in the bench trial of this case, and upon the findings already provided by the district court regarding the damages recoverable by the government from GD in the event the Frigitemp Claims are sustained. *See* 803 F.Supp. at 860. At this juncture, however, there has been no determination that GD is liable to the United States under the FCA or common law (and consequently no final determination regarding any resulting damages), and we make no such ruling. We decide only that with respect to the Frigitemp Claims, the United States has stated valid claims under the FCA and federal common law, and is entitled to have them adjudicated.

## Conclusion

In accordance with the foregoing, the judgment of the district court is reversed and remanded with respect to the Frigitemp Claims, and affirmed in all other respects. The parties shall bear their own costs.