**State of NEW YORK, Plaintiff,**

**and**

**States of Connecticut and New Hampshire, Intervenor–Plaintiffs,**

v.

**Carol M. BROWNER, Administrator of the United States Environmental Protection Agency and the United States Environmental Protection Agency, Defendants.**

No. 97–CV–1028.

United States District Court, N.D. New York.

June 1, 1999.

Office of Attorney General, Department of Law, Albany, NY, for plaintiff State of New York.

United States Department of Justice, Environmental & Natural Resources Division, Washington DC, for defendants, Kim L. Simmons, J. Jared Snyder, of counsel.

## MEMORANDUM—DECISION & ORDER

McAVOY, Chief Judge.

The State of New York brings this citizen suit pursuant to the Clean Air Act of 1990 (the "Act"), 42 U.S.C. § 7604, as amended, against defendants, the Environmental Protection Agency and its Administrator, seeking to compel them to perform their nondiscretionary duties under 42 U.S.C. § 7651 note, Clean Air Act Amendments ("CAAA"), 1990 Pub.L. 101–549, § 404, 104 Stat. 2632 (1990) (" § 404"). The States of Connecticut and New Hampshire have intervened in this action. The Complaint alleges that a report issued by the Environmental Protection Agency ("EPA") failed to comply with the statutory mandate of § 404(2) of the Act. Presently before the Court are the parties' cross-motions for summary judgment.

## I. BACKGROUND

This matter was the subject of the Court's prior Memorandum—Decision & Order dated April 21, 1998, familiarity with which is assumed. *See State of New York v. Browner*, 1998 WL 213708 (N.D.N.Y. Apr.21, 1998). The relevant facts are as follows.

In 1990, Congress added Title IV, 42 U.S.C. § 7651, to the Act. Title IV addresses the harmful effects of acid rain by requiring reductions in emissions of sulphur and nitrogen oxides. Section 404 of Title IV, 42 U.S.C. § 7601 note, provides, in relevant part, that:

Not later than 36 months after the date of enactment of this Act, the administrator of the [EPA] shall transmit ... a report on the feasibility and effectiveness of an acid deposition standard or standards to protect sensitive and critically sensitive aquatic and terrestrial resources. The study required by this section shall include, but not be limited to, consideration of the following matters ...

(2) description of the nature and numerical value of a deposition standard or standards that would be sufficient to protect such resources.

In October 1995, the EPA submitted the "Acid Deposition Standard Feasibility Study Report to Congress" (the "Report").

Plaintiffs allege that the Report failed to comply with § 404(2)'s mandate that it include a description of the nature and numerical value of a deposition standard or standards that would be sufficient to protect sensitive and critically sensitive aquatic and terrestrial resources. Plaintiffs now move for summary judgment requiring defendants to comply with § 404(2), and defendants cross-move for summary judgment seeking dismissal of the Complaint.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, judgment may be entered in favor of the moving party if "there is no genuine issue as to any material fact and [ ] the moving party is entitled to judgment as a matter of law." *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, all facts must be construed in favor of the nonmoving party. *Id.; Buttry v. General Signal Corp.*, 68 F.3d 1488, 1492 (2d Cir.1995). Where the moving party has supported the motion by affidavits and/or documentary evidence, the nonmovant "may not rest upon mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in rule [56], must set forth specific facts showing that there is a genuine issue [of material fact] for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered

against the adverse party." FED.R.CIV.P. 56(e); *see BellSouth Telecomms., Inc. v. W.R. Grace & Co.,* 77 F.3d 603, .615 (2d Cir.1996). With this standard in mind, the Court will· now address the motions for summary judgment.

## B. Section 404 of the Act

In the present matter, the parties agree· on virtually every material fact. The sole issue for review is whether defendants' Report satisfied the nondiscretionary duty under 404(2) of the Act. The central point of disagreement is the scope of the duty imposed by § 404(2). Plaintiffs maintain that defendants failed to describe the requisite acid deposition standard or standards. Defendants vehemently deny this assertion. The resolution of this dispute is a legal matter that revolves around the meaning of § 404. *See LNC Investments, Inc. v. First Fidelity Bank; N.A. New Jersey,* 173 F.3d 454, 468 (2d Cir.1999) ("[M]atter[s] of statutory interpretation and legal definition [àre] properly decided by the court, which is the 'final author[ity] on issues of statutory construction.'") (quoting *United States v. Nolan,* 136 F.3d 265, 271 (2d Cir.), *cert. denied,* — U.S. ——, 118 S.Ct. 2307, 141 L.Ed.2d 165 (1998)).

## C. What Did the Statute Require?

Plaintiffs insist that the unambiguous meaning of the statutory language, together with Congress' intent, obliged defendants to include in the Report a deposition standard or standards sufficient to protect sensitive and critically sensitive aquatic (lakes and rivers) and terrestrial (forests) resources. Plaintiffs contend that the phrase "consideration of" did not qualify or limit defendants' "obligations to address the six specified requirements in the Report to Congress, [but] that phrase instead provides simply that EPA is free to consider, and include in the Report to Congress, matters in addition to the six requirements for the Report." Pl.Mem. of Law, at 13.

Defendants insist that the plain meaning of § 404(2) required them to describe their consideration of such standards. "[Defendants] argue[ ] that the wording requires the Agency to describe in the Report the consideration the Agency has given to the listed items." Def.Mem. of Law, at 11. Alternatively, defendants assert that even if the statute required them to set forth such standards, the Report did so.

■ An analysis of statutory interpretation must, of course, start with the plain language of the statute itself. *See Northwest Airlines, Inc. v. Transport Workers Union of Am.,* 451 U.S. 77, 101 S.Ct. 1571, 1580, 67 L.Ed.2d 750 (1981); *United States v. Figueroa,* 165 F.3d 111, 114 (2d Cir. 1998); *Motor Vehicle Manufacturers Ass'n of the United States, Inc. v. New York State Dep't of Envtl. Conserv.,* 17 F.3d 521, 531·(2d Cir.1994); *Himes v. Shalala,* 999 F.2d 684, 688 (2d Cir.1993) ("On review of .an agency's construction of a statute that it administers, a court must first determine whether the plain language of the statute speaks directly to the issue.") (citing *Chevron U.S.A. v. Natural Resources Defense Council,* 467 U.S. 837, 104 S.Ct. 2778, 2781, 81 L.Ed.2d 694 (1984)). If necessary, this inquiry may be supplemented by the statute's legislative history and the underlying purpose and structure of the statutory scheme. *See Northwest Airlines,* 101 S .Ct. at 1580; *see also Rock of Ages .Corp. v. Secretary of Labor,* 170 F.3d 148, 155 (2d Cir.1999); *Motor Vehicle Manufacturers,* 17 F.3d at 531.

■ Section 404 plainly required defendants to submit to Congress. a "report on the feasibility and effectiveness of an acid deposition standard or standards to pro-·tect sensitive and critically sensitive aquatic and terrestrial resources." 42 U.S.C. § 7651 note. The parties do not .dispute this. This was the fundamental purpose of § 404; it must be borne in mind when analyzing the remainder of § 404. That section continues to state that:

The study required by this section shall include, but not be limited to, consideration of the following matters:

(1) identification of the sensitive and critically sensitive aquatic and terrestrial resources in the United States and Canada which may be affected by the deposition of acidic compounds;

(2) description of the nature and numerical value of a deposition standard or standards that would be sufficient to protect such resources;

(3) description of the use of such standard or standards in other Nations or by any of the several States in acid deposition control programs;

(4) description of the measures that would need to be taken to integrate such standard or standards with the control program required by Title IV of the Clean Air Act;

(5) description of the state of knowledge with respect to source-receptor relationships necessary to develop a control program on such standard or standards and the additional research that is ongoing or would be needed to make such a control program feasible; and

(6) description of the impediments to implementation of such control program and the cost-effectiveness of deposition standards compared to other control strategies including ambient air quality standards, new source performance standards and the requirements to title IV of the Clean Air Act.

The dispute here focuses on what information § 404(2) required in the Report. In particular, the parties disagree over the effect of the phrase "consideration of" as it relates to the requirements of § 404(2).

The Court rejects plaintiffs' overly-broad reading of the statute that defendants were required to actually set acid deposition standards. Plaintiffs' interpre-

tation must be rejected because the statute did *not* read that "the study shall include the nature and numerical value of a deposition standard or standards that would be sufficient to protect such resources." Rather, the statute reads that the study "shall include ... consideration of ... [a] description of the nature and numerical value of a deposition standard or standards that would be sufficient to protect such resources." § 404. In other words, under the plain meaning of the statute, Congress directed the Report to contain[1] consideration of the specified matters in § 404(1)–(6). This interpretation is consistent with that of defendants. *See Himes,* 999 F.2d at 689 ("[A] a court must uphold the agency's interpretation unless it is an impermissible construction of the statute.") (citing *Chevron,* 104 S.Ct. at 2782).

Having determined that the Report had to include, or contain, defendants' consideration of the specified factors, the next question is what Congress meant by "consideration"?

Under its ordinary and most common meaning, the word "consideration" means "careful thought: deliberation." Webster's II, at 301. Substituting that definition into the statute, it reads as follows: "The study required by this section shall include, but not be limited to, [careful thought or deliberation] of ... [a] description of the nature and numerical value of a deposition standard." The act of deliberating includes "[f]ormal discussion and debate of all sides of an issue." *Id.* at 358. Likewise, to "consider," the root of "consideration," means "to think about seriously, ... to believe after deliberation, to take into account." *Id.* at 301. The legal definition of "consider" is similar: "to fix the mind on, with a view to careful examination; to examine; to inspect. To deliberate about and ponder over." BLACK'S LAW DICTIONARY 277 (5th ed.1979). Thus, by requiring the Report to include consider-

---

1. The word "include" is defined as to "contain." *See* WEBSTER'S II, NEW RIVERSIDE UNIV DICT. (1994) ("Webster's"), at 619.

ation of a description of certain specified matters, Congress required a careful examination of a description of the nature and numerical value of a deposition standard or standards sufficient to protect aquatic and terrestrial resources from acid deposition. *See, e.g., Friends of the Ompompanoosuc v. FERC,* 968 F.2d 1549, 1554 (2d Cir.1992); *Merritt v. United States,* 960 F.2d 15, 18 (2d Cir.1992) (holding that statute providing that the Federal Maritime Commission "shall take into account ... ability to pay" before imposing a civil penalty required the Commission "to make specific findings on that issue."); *Doe v. Schachter,* 804 F.Supp. 53, 63–65 (N.D.Cal.1992) (holding that regulation stating that "any ... determination *must include a consideration of* ... the circumstances listed under Mitigating ·Factors" required determination to be made only after specifically addressing whether such factors applied).

By using the word "description" in § 404(2), Congress indicated that it wanted something more than a mere acknowledgment from defendants that they considered the factors set forth in § 404(2). A "description" usually entails some degree of detail. Black's law dictionary defines "description" as an "account of a particular subject by the recital of its characteristic accidents [nonessential circumstances or attributes] and qualities [essential attributes]." *See* BLACK'S LAW DICTIONARY 401 (definition of "description"); WEBSTER'S, at 71 (definition of "accidents"), and 962 (definition of "qualities"). On the other hand, the use of the word "description" also indicates that defendants were not obligated to set deposition standards. "Describing" an acid deposition standard falls short of actually "setting," that is "prescrib[ing] or establish[ing],"[2] such a standard. If Congress wanted defendants to set a deposition standard, could have explicitly directed them to do so. *See, e.g., Board of Trust-*

*ees of the CWA/ITU Negotiated Pension Plan v. Weinstein,* 107 F.3d 139, 145 (2d Cir.1997) (quoting *Faircloth v. Lundy Packing Co.,* 91 F.3d 648, 653 (4th Cir. 1996), *cert. denied,* 519 U.S. 1077, 117 S.Ct. 738, 136 L.Ed.2d 677 (1997)); *United States v. General· Dynamics Corp.,* 19 F.3d 770, 776 (2d Cir.1994). Thus, § 404(2) mandated careful examination of the essential and nonessential qualities of a deposition standard or standards necessary to protect sensitive and critically sensitive aquatic and terrestrial resources; however, it did not require defendants to actually set such standards.

These conclusions are supported by the legislative history of Title IV and, in particular, § 404. The Senate Report accompanying the bill provides that the purpose of § 404 was to direct defendants:

to report to Congress on the role that an "acid deposition standard" might play in protecting sensitive ·.·. resources from the adverse effects of acid deposition. Such a standard might provide an upper limit on the wet sulfate that would be deposited on sensitive watersheds or forested areas in any one year.... In addition to reporting on the feasibility and effectiveness of such a standard, the Administrator *is required* to identify the sensitive and critically sensitive aquatic and terrestrial resources in the United States and Canada which might be protected by a deposition standard. S.REP. No. 101–228, at 341 (1990), *reprinted in* 1990 U.S.C.C.A.N. 3385, 3724 (emphasis supplied). The above-quoted Senate Report reiterates the undisputed underlying purpose of the Report, that is, to report to Congress on the feasibility and effectiveness of implementing a deposition standard or standards. Importantly, however, the Senate Report indicates that the EPA "is required" to identify certain sensitive and critically sensitive natural resources.[3] This is significant

---

2. The pertinent definition of the word "set." WEBSTER'S II, at 1067.

3. It cannot be seriously disputed that the phrase "is required" is mandatory, not permissive. *See* WEBSTER'S, at 994.

because that portion of § 404 discussing the identification of sensitive and critically sensitive aquatic and terrestrial resources is found at § 404(1) and, like § 404(2), is prefaced by the phrase that the Report "shall include, but not be limited to, consideration of the following matters." Thus, it is evident that Congress intended the Report to specifically address the items specified in § 404(1)–(6). Congress was not making suggestions to defendants, but directed them to provide certain specified information necessary for it to make an informed decision regarding the utility of legislating acid deposition standards.

Indeed, this reading is consistent with the EPA's own contemporaneous understanding of § 404(2). *See* Report, p. 2 ("The report outlined in Section 404 ... of the Act *requires* identification of sensitive aquatic and terrestrial resources *and* description of the nature and numerical values for a deposition standard that would protect these resources.") (emphasis supplied); *see also Chevron*, 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694.

Another portion of the Senate Report reinforces these points. For example, the Senate Report unequivocally states that "[i]n addition to the identification of sensitive and critically sensitive resources, the [R]eport ... *shall also include discussion of: (1) the numerical value(s) that such a standard(s) may take....* " S.REP. No. 101–228, at 343, 1990 U.S.C.C.A.N. at 3726 (emphasis supplied). Again, the word "shall" is unquestionably mandatory. *See, e.g., In re Kerwin*, 996 F.2d 552, 559 (2d Cir.1993). Further, the statement that the

Report include a "discussion" of the values that a standard "may" take indicates that Congress was not expecting defendants to set a standard, but to examine the possible values that a deposition standard could take to protect sensitive resources.

Thus, under the plain terms of the statute, defendants were obligated to fulfill the statutory mandate by including in the Report an analysis, or examination, of the nature and numerical value of a deposition standard or standards sufficient to protect sensitive and critically sensitive aquatic and terrestrial resources. However, defendants were not obligated to set such standards.

## D. Whether Defendants Complied with the Statutory Mandate

Having found that § 404(2) obligated defendants to include a careful examination of the essential and nonessential qualities of a deposition standard or standards sufficient to protect sensitive and critically sensitive aquatic and terrestrial resources, the remaining question is whether the Report included such a description.

Both the Senate and the EPA define an acid deposition standard as "a level of deposition (most likely in units of kilograms per hectare per year [kg/hectare/year]) that provides a predetermined level of protection to specific ecological resources." Report, at xiii; *see* S.REP. No. 101–228, at 343. Sensitive and critically sensitive resources are defined as those resources with a buffering capacity of less than 200 (macro)eq/l and 40 (macro)eq/l respectively.[4] *See* S.REP. No. 101–228, at

4. A deposition standard is dependent upon resources' nitrogen saturation rates and acid neutralizing capacity ("ANC"). Essentially, certain resources are able to naturally neutralize nitrogen and resist damage from the deposition of acid compounds. This resistance is called "buffering" capacity. *See* S.REP. No. 101–228, at 342. "The presence of naturally occurring elements like carbonates and calcium in the soil of a watershed can react with the acid compounds to prevent acidification of the water and soil resources."

*Id.* Thus, the rate of a natural resource's ability to neutralize nitrogen and the quantity of nitrogen that a resource is able to neutralize necessarily effects its ability to resist acidification. The greater a resource's ANC, the more resistant it is to acidification and vice versa. *See* Report, at 9. Similarly, if a resource is already saturated with nitrogen, or is likely to soon become saturated, then it is more susceptible to acidification because its ability to continue neutralizing nitrate deposition is limited. *See* Report, at 11. "Resources with

342–343; Report, at 18 ("lakes and streams with alkalinity of 200 (macro)eq/l or less are sensitive and subject to damage at moderate acid deposition rates, whereas surface waters with alkalinity of 40 (macro)eq/l or less are critically sensitive to such effects."). Defining the level of protection Congress desired is not so easy. *See, e.g.,* Report, at xiv. Thus, resort may be had to the legislative intent.

A review of the entire statutory scheme demonstrates that Congress intended for defendants to describe, at a minimum, deposition standards sufficient to protect sensitive and critically sensitive aquatic and terrestrial resources from further acidification. *See* S.REP. No. 101–228, at 341–42 ("Such a standard might provide an upper limit on the wet sulfate that would be deposited on sensitive watersheds or forested areas in any one year.... *[A] reduction ... in ... deposition is. necessary to protect the most sensitive resources from further acidification."*) (emphasis supplied); S.REP. No. 101–228, at 343 ("Deposition rates less than this standard are not likely to result in further substantial acidification of the resources generally at risk."); S.REP. No. 101–228, at 342 ("Resources with a buffering capacity ... [less than] 200 (macro)eq/l are ... subject to damage at existing deposition rates."); *see also* 42 U.S.C. § 7651(a)(1) ("The Congress finds that the presence of acidic compounds and their precursors ... in deposition from the atmosphere represents a threat to natural resources, ecosystems, materials, visibility, and public health."); *compare* 42 U.S.C. § 7403 (requiring the acid precipitation assessment program, which includes the Administrator of the EPA, to submit a report to Congress identifying "the reduction in deposi-

tion. rates that must be achieved in order to prevent adverse ecological effects.").

█ Using the above definitions, and having reviewed the Report in its entirety, the Court finds that the Report complied with the statutory mandate by describing the nature and numerical value of a deposition standard sufficient to protect sensitive and critically sensitive aquatic and terrestrial resources.

The Report contains a comprehensive description of the nature and numerical values of an acid deposition standard or standards sufficient to protect sensitive resources. The Report details the factors, including those other than alkalinity, that impact upon a resource's sensitivity. *See* Report, at 18. This is important in identifying sensitive and critically sensitive resources. The Report then addresses the likelihood of a positive response to changes in acid deposition in the resources of specific areas, *e.g.* the Adirondacks. *See id.,* at 36. For example, the Report noted that:

Results for the Northeast indicated that these target lakes would likely respond relatively rapidly to changes in sulfur deposition, because Northeast watersheds appear, on average, to be near sulfur steady state. That is, annual loads of atmospheric sulfur deposited into most watershed approximately equal loads discharged with waters draining from the watersheds. Remaining sulfur retention capabilities of Northeast soils appear to be generally limited.

*Id.* The Report also compared the effects of nitrogen deposition with sulfur deposition. *See id.* at 46. With respect to the Northeast, the Report found that "when 50 years is assumed as the time to nitrogen

a buffering capacity less than 40 (macro)eq/l (microequivalents of alkalinity per liter) are extremely sensitive to acid deposition. Resources with buffering capacity between 40 (macro)eq/l and 200 (macro)eq/l are considered moderately sensitive and subject to damage at existing deposition rates." S.Rep. 101–228, at 342, 1990 U.S.C.C.A.N., at 3725.

The Report indicates that "[f]orest watersheds in ... North American show clear symptoms of developing watershed nitrogen saturation. In particular, early stages of saturation have been noted for surface waters and/or watersheds in New Hampshire ... [and] the Adirondack and Catskill mountains of New York." Report, at 12.

saturation, the future importance of nitrogen deposition as a direct cause of surface water acidification is projected to be greater [than the effects of sulfur deposition.]" *Id.* at 46–47.

Exhibit 13 describes some numerical values indicating that, assuming a time to watershed nitrogen saturation of fifty years and an ANC of less than or equal to 50 (macro)eq/l, an "[a]dditional decrease in acidic deposition of [Nitrogen] *at least 50%* below 1990 CAAA requirements is *likely* to produce improved conditions. *Lesser reduction in deposition* may *produce improved conditions.*" *Id. (emphasis in original). A similar reduction of sulfur deposition under those same assumptions* "may produce improved conditions." *Id.* However, assuming an ANC of ≤ 0 (macro)eq/l, then a fifty percent decrease in the acidic deposition of both nitrogen and sulfur beyond the 1990 CAAA levels is likely to produce improved conditions. See *id.*

The Report also discusses the two primary kinds of acidification, chronic and episodic, as it relates to the Northeast and stated that a deposition standard could be established for either or both types of acidification.[5] *See* Report, at 47–48. The Report concludes that:

> [R]esults for the [ ] target population of Adirondack lakes indicate a reasonable expectation that additional reductions in sulfur deposition rates, beyond those projected to accompany the 1990 CAAA, would likely produce detectable long-term improvements in ANC, regardless of the time to nitrogen saturation for the [ ] target watersheds. It is also reasonable to expect that reduced nitrogen deposition would produce detectable ANC changes in these lakes, but primarily if time to nitrogen saturation for these watersheds average 100 years or less.
>
> Although considerable uncertainty regarding time to watershed nitrogen saturation exists, if the average time to Adirondack watershed to reach nitrogen saturation is close to 100 years or less, the model predicts that maintaining the proportion of chronically acidic (ANC ≤ 0 (macro)eq/l) target population Adirondack lakes near their 1984 proportions in 2040 may require reducing anthropogenic sulfur and nitrogen deposition by 40–50 percent or more below the reductions projected to accompany the 1990 CAAA. The model projects that reductions in sulfur and nitrogen deposition of about 4.5 kg-S/ha/yr. and 7.5 kg-N/ha/yr. may be necessary to maintain proportions of sensitive lakes (ANC ≤ 50 (macro)eq/l) near their 1984 levels (i.e., 55 percent) *if* the time to watershed nitrogen saturation approaches 50 years or less.

Report, at 48 (emphasis in original).

The Report also provides a range of deposition goals necessary to achieve 1984 and pre-industrial alkalinity levels, depending upon the assumed nitrogen saturation rate. *See* Report, at 118.[6] The

5. The two types of acidification are described as follows:

> [O]ver the longer term, the fundamental character of soil and water chemistries can shift to *chronically acidic* conditions due to the input and accumulation of deposited acidic ions. Such conditions can produce long-term, chronically toxic, and lethal environmental effects. [A]cutely [or episodic] acidic conditions can rapidly develop during periods leading to, accompanying, or following episodes or events, which primarily accompany discharges of storm and snowmelt water runoff. Report at 9.

6. The Report states, in part, as follows:

> Within the limitations of significant uncertainty associated with modeling projections and time to watershed nitrogen saturation, several illustrative examples are provided. If the time to nitrogen saturation in the Adirondacks is assumed to be 50 years, model projections suggest that significant or even complete elimination of sulfur deposition, without a significant reduction in nitrogen deposition would provide at most a few percentage points of change in the affected sensitive lakes at year 2040. To maintain the proportion of Adirondack lakes with ANC ≤ 0 (macro)eq/l at levels approximating those found during the NSWS in 1984 (19 percent), model projec-

Report discusses these numerical values, how they were derived, and the assumptions upon which they were based. The Report further explains why it was necessary to use certain assumptions and the inability to derive exact numbers due to scientific limitations. *See* Report, at xiv ("Based on the remaining scientific uncertainties, particularly regarding the effects of nitrogen and the rate of those effects on the watershed, selection of an appropriate level or levels for a standard to achieve any particular environmental goal is very difficult."); xviii; xix; 43; 48; 117; and 120.

The Report continues to state that:

[a]n acid deposition standard or standards could be designed to achieve a variety of environmental protection goals. For example, the goal of a standard may be to (a) maintain specific conditions as observed at a particular point in time (e.g., conditions observed in 1984 during the National Surface Water Survey); (b) protect all systems from harmful anthropogenic effects (i.e., return to pre-industrial conditions); or (c) balance effects, costs, and other societal values. A standard can be designed to address chronic or episodic acidification and could vary by region based on the regional variability of ecological sensitivity.

Report, at xiv. This passage provides that to *protect* all systems from any harmful anthropogenic effects of acid deposition, acid levels would have to return to pre-industrial conditions. *See id.* ("[T]he goal of a standard may be to ... protect all systems from harmful anthropogenic effects (i.e., return to pre-industrial conditions.")). The Report explains that "[i]f all anthropogenic $No_x$ and $SO_2$ emissions were eliminated, background deposition levels may approximate 4 kg N/hectare/year and 1 kg S/hectare/year, and the model projects that in this case, only naturally acidic lakes would remain." Report, at 118. The Report also discusses the nature and numerical value of deposition standards necessary to achieve 1984 levels and pre-industrial levels.

In short, the Report complies with the Congressional mandate requiring consideration of a description of the nature and numerical value of a deposition standard or standards sufficient to protect sensitive and critically sensitive resources.

## III. CONCLUSION

For the foregoing reasons, plaintiffs' motion for summary judgment is DENIED, and defendants' cross-motion for summary judgment is GRANTED. The Complaint is hereby DISMISSED and the Clerk of the Court is directed to close the file.

**IT IS SO ORDERED**

tions indicate that nitrogen deposition may need to be reduced to approximately 6.5 to 7 kg N/hectare/year from the current level of 9.5 kg N/hectare/yr. Such a reduction likely would also extend the projected time for nitrogen saturation over the Adirondacks. If this reduction results in an increase in the regional time to saturation to 100 years, then the model projects that sulfur deposition may need to be reduced to approximately 5.5 to 6 kg S/hectare/year. Deposition values of 6.5 to 7 kg N/hectare/year and 5.5 to 6 kg S/hectare/year in the Adirondacks correspond approximately to a 50 percent reduction in nitrogen emissions from utility, industrial, and mobile sources from 1990 levels and an additional 50 percent reduction in utility sulfur emissions beyond those mandated by the CAAA. If instead, the time to nitrogen saturation in the Adirondacks is assumed to be 250 years, deposition values of 9.5 kg N/hectare/year and 6.9 kg S/hectare/year ... are projected to reduce the proportion of Adirondack lakes with ANC $\leq$ 0 (macro)eq/l below 1984 levels. If all anthropogenic $No_x$ and $SO_2$ emissions were eliminated, background deposition levels may approximate 4 kg N/hectare/year and 1 kg S/hectare/year, and the model projects that in this case, only naturally acidic lakes would remain.